Good morning, Your Honor, and may it please the Court, Eric Anderson appearing on behalf of the Petitioner, Lee Shagway. Today I'd really like to focus on two points, which are in somewhat of a reverse order from our briefing. The first of those is focusing on Mr. Lee's entitlement to withholding of removal. Largely that rests on a number of credibility findings that were made by the immigration judge, which we address in great detail in our briefs about how they were erroneous. And I'd like to circle back on that. But the other point that we want to touch base with is on the inapplicability of the immigration judge's ruling about the diligence of Mr. Lee in approaching his asylum and the inapplicability of the one-year bar for asylum. Does that involve a fact issue? Have there been disputed facts about the reasonableness of the petitioners? We maintain that there are not. And it's sort of a two-part analysis as to why that's the case. The first is there were no explicit credibility findings made by the immigration judge regarding the testimony of Mr. Lee consistently throughout all of his applications and through his testimony before the IJ about the reasons why he missed the one-year asylum deadline. In terms of that testimony that he put forward out there, it was very clear that he went to, when he first came to the United States, unable to speak English. He was led to use what he thought was a law firm for $1,500 to fill out his application when it turns out, in fact, the place he used it. You're addressing the issue of extraordinary circumstances, right? Right. And that turns on whether he acted reasonably or acted with reasonable dispatch in filing his application after he found out that his lawyers had let him down. That's true. Does that involve fact issues? We don't believe that it does. And there's two reasons. Again, there's two reasons for that. The first is simply one of the explanations that he had for why he did not apply immediately after finding out that this law firm was not really a law firm and it disappeared was that he was in the middle of crisscrossing the country. And one of the things that the government did over the course of this case is they opposed a motion to transfer Venue on the very basis that he was, they considered him to be a flight risk because of the fact that he had gone from working in El Cerrito, California, to working in a Chinese restaurant in North Carolina, to being apprehended going to Chicago on a train in La Harve, Montana. The fact of the matter is that you have a low-income individual who testified undisputedly that he had no money, was misled into thinking that because he had no money he couldn't afford an attorney to do what needed to be done. And so the fact that he had a period of time in which he wasn't pursuing this after he learned that his first firm had disappeared, it's explained. And the rationale of the immigration judge ignores that explanation, not because he's not credible or finding that there was a factual dispute, but simply on the basis of a very broad legal rule, which is every day that you're in this country, you should be moving forward on getting your asylum done. That rule we submit is contrary to law, it's contrary to the regulations, and it doesn't depend on a factual dispute. If the immigration judge had really focused in on the reasons that were given, and had made some findings that would indicate why there was a finding of lack of diligence, other than some sort of broad rule that applies to every immigrant, we might be in a different status. But here, Mr. Lee testified consistently, and not just when he was testifying about why he should be outside the one-year bar, but even when he first appeared in front of the immigration judges in Denver. He was asked, have you filed an asylum application? He knows nothing about the one-year bar. He says, no, I have no money, I have no attorney, because he thinks he needs to have one. As soon as the immigration judge says, well, you don't need one, he goes immediately forward and starts the process. Those are all good arguments, but don't they address the discretion of the BIA in deciding whether this is extraordinary circumstances? In some sense, yes. But the fact is that the immigration judge did not exercise that discretion to evaluate that particular testimony of Mr. Lee. Instead, the immigration judge relied on a rationale that was much broader than that, which is, you didn't do it on time, and you should have been doing it on time because you're in the United States. Therefore, you lose and you haven't shown extraordinary circumstances. In terms of the way that Mr. Lee actually acted, he has an explanation for why. He reacted reasonably once he found out that the law firm he thought he was using was no longer there. He has testimony about what why he proceeded as soon as he found out that he did have an opportunity to do that. And so that puts him within the extraordinary circumstances category. And the fact is that, at the very least, the immigration judge should have exercised his discretion to evaluate that testimony, not to come up with some sort of broad rule that, frankly, we think is inapplicable. Ginsburg. How does Ramadan affect the analysis? The way we look at Ramadan is that in the absence of any actual factual dispute with what he had with his testimony and what he said happened to him and how it happened, that this Court sits in a position to look at those facts and determine whether or not that would meet the standard, the regulatory standard. We argued in our briefs that the actual discretion that the immigration judge has is bounded by the statutory language under the Bintana case. But more importantly, do these facts, are they sufficient? Do they put him in the heartland of someone who is showing extraordinary circumstances? If this Court finds that he does and it was compelled, then that decision should be reversed all the way. On the other hand, if there was some gray area, for some reason the Court felt that there might have been, then this should be remanded for the immigration judge to actually exercise his discretion and evaluate this individual testimony in light of these individual circumstances rather than the broad rule that was laid down by the immigration judge. Now, the only reason we wouldn't get there is if somehow Mr. Lee did not qualify for withholding his removal. And frankly, that, we think, is also a large crux of this petition. Because the question of whether or not he's entitled to withholding of removal and the subsidiary question of asylum is really tied to the credibility findings of the immigration judge, which, as I mentioned, were simply cabined to what happened to him in China. There were no credibility findings, adverse credibility findings, related to his testimony concerning what happened once he got to the United States. And as we point out in our brief, the credibility findings against Mr. Lee by the immigration judge are unsustained by the record. Did I miss a question there? No, go ahead. Okay. You know, the primary focus of the immigration judge was on two minor discrepancies related to hospital documents that he produced as part of this case. The first one was, you know, Mr. Lee's testimony in his application, in his statements, before the immigration judge was consistent. On July 10th of 1999, while he was working, while he was doing zong gong, which is a slightly different form of qi gong to falun gong, which is the one most people are familiar with, the government was cracking down on the falun gong practitioners nearby. He and the other zong gong practitioners intervened in defense of the falun gong practitioners. He found himself confronted, arrested, detained for 15 days, and on the first day in his interrogation, they confronted him about his religious practices. He found himself beat by a bat, admits that he was knocked unconscious, and throughout the documentation, throughout his testimony, he consistently came back to the fact that because of the beatings that he took to his head, because of the poor treatment he received, he's very fuzzy about dates, times. In general, he was unconscious for large portions of this, or he was in a feverish state. And so he's had to rely on other people's testimony or hearsay to figure out exactly what happened to him. What he does remember is that he was there, he was interrogated, he was beat. He was treated, he came back, and then wasn't treated for the next 15 days. When he left, it took him over a month to recuperate from what had happened to him. The treatment in that prison was awful, and there was no real attack on that. But what the immigration judge did was he focused on two aspects of the documents that were provided in support. Big picture, those documents showed that he was, in fact, hurt, that he suffered the head damage that he said that he had incurred, and that he had problems with consciousness. The only question was whether one of them had a slight discrepancy about the year, because it was a secondhand document, and Mr. Lee had an explanation for that. He had produced a document, it was transcribed, errors could happen that way, and the immigration judge seemed sympathetic to that. On the second, there's a question about whether or not he was released in the morning or the afternoon, and whether he was treated before he left or after he left. We've cited numerous cases in which small discrepancies like that don't go to the heart of the matter. They're much less in the cases like Bhandari and Jabril and Zhang, where this Court has found that there wasn't sufficient evidence for an adverse inference. And I see that I'm running short on time. You know, there are a lot of other factual issues, if you have any questions about those, or not really issues, but unsupported portions of the record, if the Court had any questions for me on those. On judicial notice. Yes. Okay, you made a motion for judicial notice. Do both the California state records and the geographical facts fall into the same category with respect to judicial notice? We believe they do. The first, as we pointed out in our briefing, this Court is consistently in the immigration context taking judicial notice of disciplinary problems that notarios and others that are associated with the system have had. And the second is really more along the lines of trying to put into context the lack of facts that the immigration judge used in coming to some of his conclusions about how things work in China. Liaoning province, very large. It's bigger than California. It has 43 million people in it. And to find adverse inferences because the government may not have tracked it down immediately, we think is sheer speculation. Much worse than the things this Court found were speculation and jabril. When, for instance, somebody was shot in the stomach, said that he was able to feign, you know, unconsciousness while he was being kicked in the head, and then woke up the next day and walked into a hospital in Mogadishu and was able to be fixed up. If there are no further questions, though. All right, thank you, counsel. May it please the Court. Brianne Cohen on behalf of the United States Attorney General. Ultimately, the Court can deny this case based on the merits due to the immigration judge's adverse credibility finding, which is supported by substantial evidence. Ultimately, the record does not compel the conclusion that petitioner was credible, and therefore the Court can deny the petition for review solely on that basis. However, addressing first the preliminary jurisdictional issue regarding petitioner's asylum application, the Court lacks jurisdiction to review the asylum application as untimely. While petitioner claimed that change or extraordinary circumstances existed to excuse the untimely filing, and this Court in Ramadan and Hussein has found that it has jurisdiction to review those determinations where the facts underlying those claims are undisputed, here the facts are in dispute. If the Court were to assert jurisdiction over this one-year finding, it would be in the position of reevaluating, reweighing the disputed facts. What facts are in dispute? Well, first of all, the facts regarding going to the extraordinary circumstances finding, whether or not even assuming for the moment that that petitioner's story is true, that he went to immigration, who he thought was an immigration attorney, whether or not there were no adverse credibility findings with respect to what happened to him with the notario. Well, the Respondent's position is that the adverse credibility finding here is sufficiently broad to cover all Petitioner's testimony, because he was found to be an incredible witness, although the reasons relied on for the adverse credibility finding do only go to the merits of his claim. The immigration judge expressed some doubt as to the story that Petitioner was telling regarding going to the notario. Right, but if we take judicial notice, his story is pretty much corroborated. Well, Respondent, one would object to taking a judicial notice of those state court statements. I don't understand how you could, because we routinely take judicial notice of state court records. Well, there is some dispute in this case. Petitioner's various statements regarding the one-year issue, there are some discrepancies between those documents. For example, in his first kind of brief statement attached to the asylum application, he does name Wanko as one of the attorneys, and so that would corroborate. Is that something that the IJ should have the opportunity to consider, not you telling us what you find? Well, if that were something that were relevant, Petitioner could have brought that forward at the time. I don't think he could have. Well, he could have filed a motion to reopen with the Board, and that really would have been the proper way to raise that claim if he now has evidence that there were state court proceedings in which the attorneys were disbarred or non-attorneys were disbarred. Ms. Cohen, I'm going to do you a favor. Yes. You'll be able to answer the question a lot better if you let the judge pose it before you start answering. Oh, I'm sorry. I didn't mean to interrupt. It's okay. Judge Ferris is always a font of wisdom, and I personally listen to him. Anyway, I'm just suggesting that there isn't really a determination on that aspect, and it might be something that we should send back and let the records come in, given that if he – I don't know exactly where this stands procedurally, but I don't know if he's time-barred now, for example, from a motion to reopen. Well, I think he may – To make up the case, you know. Right. Well, he may be time-barred now, but, again, there are exceptions that this had been new evidence. And so there is a procedure by which he could have presented this evidence to the agency in the first instance, and he's failed to do so. So I don't think the proper remedy is for this court to then order a remand back for the court to consider that information. And going – So I guess to just decide it? Well, I think that this can all be avoided, because ultimately the immigration judge found that regardless of his story, he didn't act within a reasonable time of when he discovered the alleged ineffective assistance. So we know that from his statements, if we're assuming that they're true, if we're assuming that the adverse credibility findings did not extend to his statements regarding the ineffective assistance, that he knew within five months of his arrival that something was wrong with his application and that he knew within 10 months that nothing had been done. Right. And if you exclude that 10 months, by the time he filed, he's within the one year. Well, but he still waited seven months. I don't think it – I don't think the correct inquiry would be whether he filed within a year necessarily. It's whether or not the immigration judge feels under the circumstances that it's a reasonable time within that. So I don't know that it necessarily means that we have to give him another year from the time that he discovered the ineffective assistance. It's whether or not it's reasonable within the circumstances. And here, given the delay and given the heads-up that he was given at the five-month mark, waiting another seven months to file his application, the immigration judge found to be unreasonable. And this is compounded by the fact that he didn't file his asylum application until after he was apprehended by immigration authorities and issued a notice to appear. But isn't that disregarding his clear belief and testimony that he thought he had to have a lawyer in order to file? Well, I think the immigration judge found that under the circumstances that wasn't really a reasonable belief for him to have. There's no reason that he would have believed that he needed to have a lawyer to file the application. That's not required. Similar to him believing that he didn't have enough money, the immigration judge specifically found that those were unreasonable explanations. And so if the immigration judge in his discretion found that that was unreasonable, then first, as we've argued before, the Court lacks jurisdiction over that because it is a factual determination. And second, even if we looked at the merits, the immigration judge's decision is reasonable in light of the surrounding circumstances. Moving on to the average credibility determination. The immigration judge gave a number of reasons for his average credibility decision, and the record doesn't compel the conclusion that a petitioner is credible. For example, the discrepancies in the medical documents. There was a year difference in the medical document between the time that he said that he received medical attention and the time that the document was written. Also, there was some internal inconsistencies in his testimony. He was asked very clearly on direct examination whether or not he received any medical care while he was in the detention center and explicitly answered no, and then later changed his testimony when he was confronted with the medical documents. There were also some significant omissions between what he first claimed in his asylum application and his ultimate testimony. For example, the story of his escape. In his initial claim, he just said that he escaped with the help of a friend. Later, he testified very clearly that he was at home, that the police arrived, that his wife helped him narrowly escape through a window, and then he went into hiding for nine months, and none of that was mentioned in his initial asylum affidavit. Or the subsequent statements that he submitted when he retained counsel and was given the opportunity to correct and amend his application. I'm just wondering how the findings of these discrepancies, the IJ listed, go to the merits of his claim for withholding. Do they go to the question when he's entitled to withholding, when he's made a showing? How they go to the... How do they go to the merits of his withholding claim? Well, these all surround the alleged attack on July 10, 1999, which really forms the basis of his claim and his claim pursued by authorities and ultimate escape from China, because they all go to sort of the heart of what his claim for asylum and withholding were, that he was persecuted as a Xiongnong practitioner. Well, there's no question, is there, about his testimony concerning the persecution that he suffered? That is, the arrest, the beating, and the related treatment that he got. Well, the immigration judge found his testimony incredible. Not that testimony. I'm sorry. Not the testimony relating to the particular treatment that he received. That's the basis for persecution. I think that the immigration judge made a pretty broad adverse credibility finding, finding that the merits of his claim simply were not believable. So I think that he used these examples as part of how he made that determination, but ultimately found that the entire claim was incredible. So I think there was a question as to the validity of that claim. Moving on just briefly, and I just, because this case involves significant omissions, and I know that there is a concern that sometimes, you know, there's a difference between providing more detail and omitting something from a claim. In this case, the Petitioner was given a number of hearings for the immigration judge. I believe there were 14 in all. And he was represented by counsel who did make efforts to amend and correct his application, but still failed to make these corrections, which were later alluded to in his testimony. So there are significant omissions. They do go to the heart of his claim, and he did have the opportunity to address them before his testimony and failed to do so. So we submit that they do support the adverse credibility determination. If there are no further questions, we ask that the Court deny the petition for review. Thank you. Thank you, counsel. Lye v. Mukasey will be submitted, and this session of the Court is adjourned.
judges: Farris, Wardlaw, Schwarzer